# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### July 25, 2012 Session

## METROPOLITAN DEVELOPMENT AND HOUSING AGENCY v. TOWER MUSIC CITY II, LLC, ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 09C3636     Joseph P. Binkley, Jr., Judge**

---

**No. M2012-00108-COA-R3-CV - Filed April 30, 2013**

---

In this condemnation action, the condemning authority appeals the jury's valuation of property taken and award of compensation to landowner. Finding that the valuation of the property is within the range of opinions of fair market value testified to at trial, that the jury was properly instructed, and that the court's conduct of the trial was proper, we affirm the judgment entered upon the jury's verdict.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, P. J., M. S., joined. FRANK G. CLEMENT, JR., J., filed a concurring opinion.

Robert J. Walker, J. Mark Tipps, John C. Hayworth, Jason W. Callen, and G. Brian Jackson, Nashville, Tennessee, for the Appellant, the Metropolitan Development and Housing Agency.

Charles K. Grant, Nashville, Tennessee; Joe A. Conner and John M. Phillips, Chattanooga, Tennessee; Alton G. Burkhalter, Irvine, California, for the Appellees, Tower Music City II, LLC and PremierWest Bank.

## OPINION

This appeal arises out of an eminent domain action initiated by the Metropolitan Development and Housing Agency. The issue before this court is whether the jury's determination of the value of the land taken should stand.

In January 2007, Tower Music City II, LLC ("Tower") purchased a 5.66-acre surface parking lot located at 301 5th Avenue South in downtown Nashville ("the Property") for

$14.78 million. On October 16, 2009, the Metropolitan Development and Housing Agency ("MDHA") filed a petition for condemnation seeking to acquire, through the exercise of eminent domain, fee simple title to the Property in furtherance of the "Convention Center Project a/k/a Music City Center" ("the Convention Center"). The petition named Tower and PremierWest Bank ("PremierWest"), the holder of a promissory note secured by a deed of trust encumbering the Property, as respondents. In accordance with Tenn. Code Ann. § 29-17-105, MDHA deposited $14,800,000 with the clerk of the court, representing MDHA's estimate of just compensation for the Property.

Tower answered the complaint and denied that MDHA had the authority to take the Property and asserted, *inter alia*, that the sum deposited by MDHA was insufficient compensation. PremierWest answered the complaint and asserted that it held a prior perfected security interest against the Property and had a valid lien against the proceeds of the condemnation. Both Tower and PremierWest opposed MDHA's exercise of eminent domain.

A hearing was held, and on February 5, 2010, the trial court entered an order that awarded possession of the Property to MDHA. Thereafter, the court ordered that a jury of view be empaneled and a trial held to determine just compensation for the Property. After a trial on August 9–10, 2010, the jury of view determined that the fair market value of the Property was $16,100,000 and awarded that amount as just compensation. Tower and PremierWest filed a notice of appeal and, pursuant to Tenn. Code Ann. § 29-16-118, sought a *de novo* jury trial.

After numerous procedural delays, including the transfer of the case to another judge, a jury was empaneled and the matter tried on July 18, 2011. At the close of proof, MDHA moved for a directed verdict that the value of the Property was $14.8 million; MDHA's motion was denied. Thereafter, the jury rendered its verdict and found that the fair market value on the date of the taking was $30.4 million. MDHA filed a motion seeking a new trial, a remittitur, or a judgment notwithstanding the verdict; the motion was denied.

MDHA appeals, raising the following issues:

1. Did the trial court err in denying the motion for directed verdict?

2. Did the trial court err when Tower was permitted at trial to display and argue about an architect's rendering of an imaginary high-rise mixed-use development on the Property?

3. Did the trial court err when it provided a "highest and best use" special jury instruction?

4. Did a statement during *voir dire* likely affect the jury's verdict in this case such that a new trial is warranted?

5. Did the trial court err when it gave an instruction suggesting that the jury had to adopt one of the specific expert values offered into evidence and/or when it failed to answer the jury's question about the instruction or otherwise clarify the issue?

6. Did the trial court err in failing to discharge its duties as thirteenth juror?

Tower does not raise separate issues for resolution.

DISCUSSION

I. Jury Instruction Issues

A. Tennessee Pattern Instruction 11.15

A substantial portion of the jury charge which specifically addressed eminent domain incorporated Tennessee Pattern Instructions ("T.P.I.") 11.01, 11.02, 11.03, 11.15 and 11.16. MDHA contends that T.P.I. 11.15 is confusing and that, when the jury submitted a question relative to the instruction, the court failed to appropriately respond.

"[T]he determination of proper instructions to the jury is a question of law to be determined from the theories of the parties, the evidence in the record and the law applicable thereto." *Solomon v. First Am. Nat. Bank of Nashville*, 774 S.W.2d 935, 940 (Tenn. Ct. App. 1989). As our Supreme Court noted in *State v. Rimmer*, the pattern instructions are not officially approved by the Court or the Legislature and are "suggestions" for the trial court; they are not entitled to deference on review. *State v. Rimmer*, 250 S.W.3d 12, 30 (Tenn. 2008). The Committee of the Tennessee Judicial Conference which prepared the instructions noted:

These instructions are not official and no prior approval of any instruction has been sought from the Supreme Court or the intermediate Appellate Court. They are as subject to objection and reversal as instructions have always been. The instructions do not presume to replace the individual judgment of the trial judge and they are offered merely as a guide, not a

-3-

straitjacket, and as a slave, not a master. It may be necessary to modify the instructions from time to time, depending on the facts of the case.

8 Tennessee Practice, Tennessee Pattern Jury Instructions – Civil IX (3rd ed. 1997).

T.P.I. 11.15 states:

You must determine the fair cash market value of the subject property [and the incidental damages, if any,] [and special benefits, if any,] only from the opinions of the witnesses who have testified.
You may not find the market value of the property [or incidental damages] [or special benefits] if any, to be less than or more than that testified to by any witness. While owners and valuation witnesses may express opinions on the issue of value, those opinions are worth no more than the reasons and factual data upon which they are based. The evidence you have heard concerning the reasons for their opinions of value, and all other evidence concerning the subject property [and other properties], is to be considered only for the limited purpose of enabling you to understand and weigh the opinions of the witnesses regarding the market value [and incidental damages [and special benefits], if any.
You should determine the weight that should be given to each opinion, and resolve conflicts in the testimony of different opinion witnesses. You should consider:
1. The education, qualifications, and experience of the witness[es];
2. The credibility of the witness[es];
3. The facts relied upon by the witness[es] to support the opinion; and
4. The reasoning used by the witness[es] to arrive at the opinion.

MDHA asserts that the first two sentences of the instruction are confusing and that the sentences "erroneously suggests that the jury must adopt a specific expert opinion of value." We do not agree.

Considered in its entirety (and as adapted by the trial court in this case), T.P.I. 11.15 correctly charges the jury that value is to be determined from the opinions of witnesses and other evidence bearing on value and that, in its deliberations, the jury is to determine the weight to be given each opinion and to consider the factual basis of the opinion. The two sentences cited by MDHA, considered in context, do not suggest that the jury is to emphasize any particular piece of evidence. In this case, four witnesses–three appraisers and the Vice President of Tower–opined as to the value of the property; each was examined and cross-examined at length and the opinions of value ranged from $14.8 million to $35.2 million.

The instruction properly guided the jury as to how it should regard the conflicting testimony and instructed that the verdict should be within the range of opinions.

### B. The Response to the Jury's Question

In the course of its deliberations, the jury sent the court the following question: "Does the fair market value have to be the exact amount of one of the appraisers or can it be any amount between the highest and lowest amount appraised?" The court and counsel conferred and all agreed that the jury would be instructed to re-read that portion of the charge which incorporated T.P.I. 11.03.[1] MDHA asserts that the fact that the jury asked the particular question showed that the jury was confused by the wording of T.P.I. 11.15 and the confusion was not clarified by the court's response to the jury's question.

---

[1] The colloquy between the court and counsel extended for eight pages in the transcript; it began and ended as follows:

> THE COURT: This is now Chambers. I declare this to be Chambers. Okay. First question the jurors have asked: Does the fair market value have to be the exact amount of one of the appraisers, or can it be any amount between the highest and lowest amount appraised?
> What are Tower's thoughts about that, as far as an answer is concerned?
> MR. GRANT [Counsel for Tower]: Yes. Clearly, the law is it can be any amount between the highest and lowest appraiser.
> THE COURT: What do you say, MDHA?
> MR. JACKSON [Counsel for MDHA]: Your Honor, that's an accurate reflection of the law. I think the answer - - I mean, if you're asking what our opinion on the answer should be, it's that - -
> THE COURT: I am.
> MR. JACKSON: - - we should repeat 11.03, the measure of damages, and which defines the measure of damages. "The measure of damages is the fair cash market value of the land on the date of the taking," et cetera.
> * * *
> THE COURT: Here is the response to the question, Does the fair market value have to be the exact amount of one of the appraisers, or can it be any amount between the highest and lowest amount appraised?
> Joe P. Binkley Jr.'s answer to this question - - Judge Joe P. Binkley Jr.'s answer to this question: Please re-read the jury charge, beginning with the fourth full paragraph on page number 5 through the end of page number 5 and the first two sentences of page number 6.
> MR. JACKSON: That's acceptable, Your Honor.
> MR. GRANT: Very well, Your Honor.

In our review of this issue, we begin with the presumption that the jury followed the instruction. *See Duran v. Hyundai Motor Am., Inc.*, 271 S.W.3d 178, 212 (Tenn. Ct. App. 2008) ("When the conduct of a jury is challenged, the appellate courts begin with a presumption that juries are honest and conscientious and they have followed the instructions given to them."). The jury's question related to fair market value; T.P.I. 11.03 defines fair cash market value[2] and, in conjunction with T.P.I. 11.15, guides the jury in its determination of value. The jury did not seek further clarification or make a further request relative to the charge and we do not assume that there was any confusion on the part of the jury after it was given the response to its question; as in *Duran*, there is "no objective basis for determining that the jury did not follow the trial court's instructions." 271 S.W.3d at 212. Considering the nature of this case and the proof put before the jury, we do not agree that the response suggesting that the jury re-read the portion of the instruction which incorporated T.P.I. 11.03 was inadequate or inappropriate.[3]

## C. The Special Instruction

In addition to the pattern instructions, the court gave the following special instruction at the request of Tower:

---

[2] T.P.I. 11.03 states:

> The amount of damages to be paid is the fair cash market value of the land and improvements on [February 5, 2010], the date of taking.
> Fair cash market value means the amount of money that a willing buyer would pay for the property and that a willing seller would accept, when the buyer is not compelled to buy and the landowner is not compelled to sell. In determining fair cash market value, you must consider all of the property's legitimate potential uses.
> It is the fair cash market value at the time of the taking that must be determined and not what the property might be worth at some time in the future. You may, however, consider future value if, on the date of the taking, the probability of the future value had an effect upon its present value.
> In determining the fair market value, do not consider any possible increase or decrease in value caused by the announcement or construction of the public improvement for which the property was taken.
> The taking authority is not required to replace the property taken with other identical property or to reconstruct improvements on the property. However, the taking authority must pay the landowner[s] the fair cash market value of the property that has been taken.

8 Tennessee Practice, Tennessee Pattern Jury Instruction – Civil § 11.03 (2012 ed.).

[3] Our resolution of this issue pretermits our consideration of Tower's contention that MDHA has waived its argument.

In determining fair market value, you must consider all legitimate uses of the property and all uses to which the property may reasonably be adapted. You must consider the characteristics of the property in determining the highest and best use. Additionally, you should also consider the highest and best use for the property now and in the reasonable future. A property's highest and best use is the reasonably probable and legal use of vacant land that is physically possible, appropriately supported, financially feasible, and that results in the highest value. Possible future uses of the property may be considered; however, you should not consider any future uses of the property that are unfeasible or too remote to affect the current fair market value of the property. Even if a potential use is remote in time, it should be considered if it affects the fair market value of the property on the date of the taking.

MDHA contends that the additional instruction "inappropriately emphasized the 'highest and best use,' to the exclusion of all other uses, and effectively encouraged the jury to value the subject property based solely on that use."

Whether an additional instruction on highest and best use was necessary and, if it was, what the content of it should have been, was the subject of much discussion in the jury charge conference. MDHA felt that T.P.I. 11.03 adequately covered highest and best use and, if not, the court should have incorporated into the charge a reference to Tenn. Code Ann. § 29-17-1004, a statute it had previously read to the jury.[4] Tower contended that the additional instruction was necessary in light of the fact that the jury had heard "quite a bit of evidence as to what the highest and best use of the property will be." In the course of the discussion, the court discussed the overlap between T.P.I. 11.03 and the special instruction

---

[4] Tenn. Code Ann. § 29-17-1004 states:

Notwithstanding any law to the contrary, in any condemnation proceeding in this state, an appraisal of the property must be obtained. The appraisal shall value the property considering its highest and best use, its use at the time of the taking, and any other uses to which the property is legally adaptable at the time of the taking. Any appraiser making an appraisal must possess the designation Member of the Appraisal Institute (MAI), or be an otherwise licensed and qualified appraiser under title 62, chapter 39.

This statute was read to the jury immediately prior to the testimony of the first expert appraisal witness, Mr. James Lamb.

and noted that T.P.I. 15.02[5] would also be a part of the jury charge; the court concluded:

> Now Mr. Jackson's point is well taken about 11.03, Tennessee pattern instruction. But really that's more like the discussion of the measure of damages, and then it draws in about future value that can be considered if it has an effect upon its present value. It's all a part of determining fair market value. It is a repetition and does have some repetitive factors on highest and best use.
>
> And I don't think–I think as we observed, when I say we, I'm talking about the lawyers, you all and me, observed earlier, there is no pattern instruction on highest and best use as such, and there probably ought to be, but there's just not one. So we have to–I think we have to craft one as best we can that will be helpful to these lay people to understand what highest and best use means.

Viewed in the context of the entire instruction, as well as with due consideration to the extensive proof of value before the jury, we cannot say that the court erred in giving the additional instruction as worded. Tower's theory throughout the trial was that it should receive the highest value for the land–which Tower contended was the value if the land was put to its highest and best use–and put on evidence in support of that theory; Tower was entitled to an instruction that explained how the jury should consider the evidence of possible future uses of the property as related to the present value. As noted by the court, T.P.I. 11.03 did not specifically address highest and best use under the nature of the evidence presented. The additional instruction is not inconsistent with T.P.I. 11.03 and was appropriate given the opinions expressed by the experts who testified as to value.

II.  Trial/Procedural Issues

A.  The Denial of MDHA's Motion for a Directed Verdict

At the close of the proof MDHA moved for a directed verdict that the property be valued at $14,800,000; MDHA contends that the court erred in denying the motion.

---

[5] T.P.I. 15.02 states:

All of the instructions are equally important. The order in which these instructions are given has no significance. You must follow all of the instructions and not single out some and ignore others.

8 Tennessee Practice, Tennessee Pattern Jury Instructions–Civil § 15.02 (2012 ed.)

The standard of review we apply to the denial of MDHA's motion was set forth in *Alexander v. Armentrout*:

> A directed verdict is appropriate only when the evidence is susceptible to but one conclusion. We must "take the strongest legitimate view of the evidence favoring the opponent of the motion when called upon to determine whether a trial court should have granted a directed verdict." In addition, all reasonable inferences in favor of the opponent of the motion must be allowed and all evidence contrary to the opponent's position must be disregarded.
>
> As this Court has stated: "The court may grant the motion only if, after assessing the evidence according to the foregoing standards, it determines that reasonable minds could not differ as to the conclusions to be drawn from the evidence."

*Alexander v. Armentrout*, 24 S.W.3d 267, 271 (Tenn. 2000) (citations omitted).

The jury's award of $30,400,000 is supported by the testimony of James Lamb, one of Tower's expert witnesses. MDHA contends that Mr. Lamb improperly focused on highest and best use in his valuation; that the difference between the 2007 sale price of the property $14,780,000 ($53 per square foot) and the jury's award of $30,400,000 ($123 per square foot) reflects a "100% increase in value", which undermines the integrity of the evidence to the point that the verdict is not supported by material evidence; and that various factors occurring between 2007, when Tower bought the property, and 2010, when the jury valued it, militate against the valuation.

Mr. Lamb discussed highest and best use when he testified regarding his approach to the valuation of the property:

> Q.     Okay. Could you just explain to the Ladies and Gentlemen of the Jury what you do when you use the sales comparison or comparable sales approach?
> A.     In essence, what we do is we attempt to first work through a highest and best use analysis. And after working through that highest and best use analysis, we get an idea of, okay, what type of development is the most likely, most probable, financially feasible, legally allowed, can be done based on its physical characteristics.
>      You consider all of those factors and you consider all of the different types of uses in the zoning code, and from that you come to ultimately what would yield it the highest value, yield it the highest value based on it being

feasible, based on it being at least the most probable use, some use that the neighborhood has or is trending toward showing it can do.

   After establishing that highest and best use, then you move into the evaluate, actual valuation portion, go out and find comparable land sales, sales that have happened in the past or very recent history that are at least having some similar characteristics of what your highest and best use could be.

   And from that standpoint, after analyzing those comparable sales, you analyze them through several factors and make adjustments to them, and from that process, that will get us to what we conclude our market value would be.

Q.    All right.  So going back then to your analysis of highest and best use, the four factors, are they physically possible, legally permissible, financially feasible, and finally maximally productive, right?

A.    Yes.

He then proceeded to give his opinion as to each factor, identifying specific features of the property that fit each, and concluded:

Q.    All right.  So now wrapping all of that together, what is your highest and best use conclusion for this property, Mr. Lamb?
                              * * *
THE WITNESS:    Well, the conclusion is that a mixed-use development and a good Class A office space, upper - - excuse me - - upper upscale hotel space and some retail space.  All demand factors indicate that development can begin in the very short-term.  However, as we discussed, there's probably a buyer recognized that risk of let's postpone it for another year as we will wait and see, despite the demand factors.  And it must recognize that development timeframe of three years to complete the process.

After opining as to highest and best use, he testified as follows:

Q.    All right.  And so now that we're at this spot where you understand the highest and best use of this property, what did you do next?

A.    Now, the next step is, well - - the next primary step is to get into the actual appraisal process or valuation process, and that's going and looking for comparable land sales that meet certain criteria with regards to, is it in a similar location, how recent is the sale?  You are looking for potentially, in some form or fashion, being the similar highest and best use of your property.  These are the types of things you're looking for when you go and look for a comparable sale.

Mr. Lamb next discussed four parcels which he determined were comparable and upon which his valuation of the Tower property was based. He detailed several factors he used in making the initial determination that the parcels were comparable to the Tower parcel including, *inter alia*, proximity to Tower's property; features of the comparable properties' locations; date of sale; size, nature and use of the comparable properties; zoning; and amenities available. He then proceeded to value each parcel as follows: one parcel with a sale date of June 2007 at $90.62 per square foot; another with a sale date of April 2008 at $84.58 per square foot; another with a sale date of February 2008 at $151.50 per square foot; and the fourth at $156.61 per square foot.[6]

Viewing Mr. Lamb's testimony in its entirety–and in context–MDHA's objections are not well taken. We find nothing inappropriate in his methodology or valuation and both were subjected to extensive and rigorous cross-examination; the value assigned by the jury for the Tower property was within the range of values opined by Mr. Lamb for the sale of comparable property.

Applying the standard of review set forth in *Alexander v. Armentrout*, we conclude that reasonable minds could accept Mr. Lamb's opinion of value; consequently, the trial court did not err in denying MDHA's motion for a directed verdict and allowing the valuation issue to proceed to the jury.[7]

B. Statement During Voir Dire

MDHA contends that a question that Tower's counsel posed to the prospective jurors in the course of voir dire put irrelevant and misleading information before the jury and that a mistrial was appropriate.

The cases holding that conduct of voir dire is vested in the sound discretion of the trial court and that the court's action will not be disturbed unless there is an abuse of that discretion are legion. *See State v. Reid*, 164 S.W.3d 286 (Tenn. 2005); *State v. Jefferson*, 529 S.W.2d 674 (Tenn. 1975); *State v. Cox*, 644 S.W.2d 692 (Tenn. Crim App. 1982) (trial court has wide discretion in controlling examination of prospective jurors); *Williams v. Bridgeford*, 383 S.W.2d 770 (Tenn. Ct. App. 1964) (clarification of any confusion involved in questioning of jurors is within discretion granted the trial court).

---

[6] Mr. Lamb testified that the value of the fourth parcel was based on a 99-year lease, rather than a sale of the property; this transaction occurred in 2007.

[7] For the same reason, we hold that MDHA's objection to Mr. Lamb's opinion of value is not well taken and that his opinion is material evidence in support of the jury's award.

The question asked prospective jurors was:

> One of the issues in this case is who is paying for the land over there that was–formerly belonged to Tower, obviously, that's been taken by MDHA for the convention center to go up over there, and who is paying for that? And the land is being purchased from funds that were collected from tourist-related activity, tourist taxes. So, in fact, it is being paid for by people who are not Davidson County–basically, people who are outside of Davidson County is where it's coming from, tourist-related taxes.
> Does the fact that the land is being paid for by mostly tourists, as it were, does that enter into your mind at all as to whether or not Tower can get a fair trial today if the fair market value is determined to be something–a large number? Would that affect you at all?

MDHA's counsel objected to the question and a prolonged discussion ensued; the court determined that the question should have been asked in a different way and that the appropriate action would be to give the jury the following curative instruction:

> If you're selected to serve on this jury, and during the process of all these questions, and when you are selected to serve on this jury, of course, only 14 of you are going to do that, but this is for everyone in the courtroom, the jury should not consider for any purpose the source of payment in reaching your verdict on what is just compensation, just meaning fair, just compensation for the Tower property. Let me repeat that.
> Jury should not consider, for any purpose, the source of payment in reaching your verdict on what is just compensation for the Tower property. All right, that's the instruction.

The court then asked if there were any prospective jurors who could not follow the instruction and ended up excusing three who responded that they could not.

Voir dire in the case extended over a two day period; the transcript demonstrates that the trial judge was very involved in the process, asking preliminary questions before allowing counsel to interrogate further. Counsel was given latitude in questioning prospective jurors and challenges for cause were not particularly contentious. The dispute regarding the question at issue arose in the second day of voir dire. When the question was asked and objection made, the court allowed MDHA's counsel to explain its position that the question was improper and misleading and Tower's counsel to explain the factual basis of the question; the court then determined that the curative instruction was appropriate.

On the record before us we cannot conclude that the trial court abused its discretion in the manner in which it handled this situation. The dispute was one of a multitude of disputes in this vigorously litigated case, and the record does not support a finding that the court's decision to give the instruction was inappropriate or inadequate or that the question had any effect on the jury as subsequently seated or on its verdict.

## C. Architect's Rendering

MDHA next complains that the trial court erred in allowing Tower to display to the jury an architect's rendering of an imaginary development on the condemned property; MDHA argues that the effect of the illustration was to exacerbate Tower's over-emphasis on highest and best use. The particular drawing was not introduced as an exhibit but was marked for identification and testified to by John Pierce, Tower's senior vice president; consequently, we address this issue under the standards applicable to our review of the introduction of evidence.

A trial court's ruling on the admissibility of evidence is within the sound discretion of the trial court and issues regarding the admission of evidence are reviewed by this court under the abuse of discretion standard. *Dickey v. McCord*, 63 S.W.3d 714, 723 (Tenn. Ct. App. 2001). We will only reverse a decision regarding the admissibility of evidence upon a showing of an abuse of discretion. *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1992). An abuse of discretion occurs when a court either goes beyond the framework of the applicable legal standards or when a court fails to properly consider the factors customarily used to make that discretionary decision. *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007).[8]

---

[8] The court in *Lewis* stated:

Generally, questions concerning the admissibility of evidence rest within the sound discretion of the trial court and this Court will not interfere with the exercise of this discretion in the absence of a clear showing of abuse appearing on the face of the record. An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." "[D]iscretionary choices are not left to a court's inclination, but to its judgment; and its judgment is to be guided by sound legal principles." "Abuse is found when the trial court has gone outside the framework of legal standards or statutory limitations, or when it fails to properly consider the factors on that issue given by the higher courts to guide the discretionary determination."

*Lewis*, 235 S.W.3d at 141 (citations omitted).

Before allowing the jury to see the drawing and hear Mr. Pierce testify, the court and counsel discussed at length the purpose of its presentation. The record reflects that the court was concerned with balancing Tower's right to show the jury a demonstrative aid in support of its theory that it was entitled to receive the value for the land if it were put to its highest and best use–which Tower contended was as a mixed use, high rise development–with a concern that the drawing not overemphasize in the minds of the jurors the possible use of the property for such a development. The court was particularly concerned, based on its reading of *Memphis Hous. Auth. v. Mid-South Title Co.*, 443 S.W.2d 492 (Tenn. Ct. App. 1968), that the jury properly consider all available uses of the property.[9]

The trial court correctly noted that the standard to be applied to determine whether particular testimony or a demonstrative aid should be excluded for overemphasis of a particular use, is when the testimony or aid goes beyond an explanation of the witness' valuation process. *See Memphis Housing Authority*, 443 S.W.2d at 497–98. In allowing Mr. Pierce to present the aid to the jury the court ruled:

---

[9] In *State v. Bessie Louise Parkes, et al.*, 557 S.W.2d 504 (Tenn. Ct. App. 1977), the court articulated the balance which the trial court in this case was attempting to strike thusly:

> A related objection to the testimony of Parkes and Evans concerns the rule that a witness in an eminent domain proceeding will not be allowed to state the value of the property for a specific purpose. This rule, a corollary of the requirement that all uses be considered in determining value, originally was used to protect against an overemphasis on the use for which the property was being taken, and to prevent the jury from valuing it in terms of its particular importance to the condemnor. In *Davidson County*, supra, however, the rule was applied to uphold exclusion of a map, prepared by the landowners for use in the eminent domain proceeding, which detailed an imaginary plan for subdividing the property taken. Similarly, in *Memphis Housing Authority*, supra, it was held error to admit plans which were introduced by the owners of the taken property and which graphically depicted placement of a nine story motel on it. These cases, while stating broadly that testimony of value for a single particular purpose is inadmissible, clearly demonstrate that the concern underlying this rule is to prevent overemphasis of any single use of the property, and especially that overemphasis which results from depicting excessive details of a possible use. A broad prohibition against description and valuation of a particular use, however, may conflict with the widely acknowledged privilege of the witness to explain how he arrived at his value for the property, if he has taken the peculiarities of one particular use into account in making his estimate. Obviously, a balance must be struck. Since the major concern of the *Davidson County* rule to prevent overemphasis of a particular use and its value, its effect must be to require excluding evidence of a particular use when it reaches the point of being an unreasonable emphasis on that use and not merely an explanation of the witness's valuation processes.

*Parkes, et al.*, 557 S.W.2d at 508 (citations omitted).

-14-

THE COURT: . . . Regarding the ruling I just made in reviewing the State of Tennessee versus Parkes case, which I've already referenced, the Court there states a balance must be struck in trying to prevent an overemphasis of the highest and best use, and my view is the color exemplar of 109-011, is not an overemphasis but - - and I'm allowing this one photo, because if I make a broad prohibition as stated in the State of Tennessee versus Parkes case, a broad prohibition against description and valuation particular use, I would be infringing on the privilege of the witness to explain how he arrived at his value for the property.

And one of the uses of the property is highest and best use, and this is an example of what the highest and best use might be sometime in the future. And all of this is, of course, subject to cross-examination.

***

THE COURT: Well, and I was really asking that for your benefit, Mr. Jackson. So I know that you object to it, and I wanted to make it as palpable for you as possible, because I think you have got a good point. I think it's a close call, but I'm going to let it in because it's a good explanation of what we're talking about. And so the cross-examination is the best modifier.

Mr. Pierce testified that the illustration was:

[A]n example of some modeling, actually, that - to show under the - what can legally be built on the property. These are high-rise buildings that could be used for office or hotel or for condominiums, or a variety of different uses. It's just - there's no particular use here, other than the fact that you can just see these are the - what can legally be built on the property.

Prior to ruling, the court had broached with MDHA's counsel the possibility of giving the jury a special instruction that the drawing was an illustration of what the land could be used for as a counter to MDHA's pictures of the use of the land at the time of condemnation. The ruling demonstrates that the court considered both sides and we find nothing to demonstrate that the illustration or Mr. Pierce's testimony relative to it overemphasized the property's use within the contemplation of the cases cited above; we do not find that the court abused its discretion in allowing it to be shown to the jury.

D. The Trial Court's Role as Thirteenth Juror

MDHA next contends that the trial court made two statements at the hearing on MDHA's motion for a new trial which "plainly suggest it relied upon an improper thirteenth-juror standard and had serious doubts about the verdict and the jury process."

The thirteenth juror rule originated at common law and requires the trial court to independently weigh the evidence, pass upon the issues, and decide whether the verdict is supported by the evidence. *State v. Moats*, 906 S.W.2d 431, 433 (Tenn. 1995) (citing *Curran v. State*, 4 S.W.2d 957, 958 (1928)). Over one hundred years ago, our Supreme Court articulated the rule as follows:

> [T]he circuit judge hears the testimony, just as the jury does, sees the witnesses, and observes their demeanor upon the witness stand; that, by his training and experience in the weighing of testimony, and the application of legal rules thereto, he is especially qualified for the correction of any errors into which the jury by inexperience may have fallen, whereby they have failed, in their verdict, to reach the justice and right of the case, under the testimony and the charge of the court; that, in our system, this is one of the functions the circuit judge possesses and should exercise—as it were, that of a thirteenth juror. So it is said that he must be satisfied, as well as the jury; that it is his duty to weigh the evidence, and, if he is dissatisfied with the verdict of the jury, he should set it aside.

*Cumberland Tel. & Tel. Co. v. Smithwick*, 79 S.W. 803, 804 (Tenn. 1904).[10]

The first comment referenced by MDHA was made relative to the response to the jury's question discussed previously at section I B of this opinion; the court stated:

---

[10] The rule, as well as this court's standard of review of the trial court's ruling as thirteenth juror, was more recently stated as follows:

> When acting as the thirteenth juror in considering a motion for a new trial, the trial court must independently weigh the evidence, determine the issues presented, and decide whether the jury's verdict is supported by the evidence. If, after weighing the evidence, the trial court is satisfied with the jury's verdict, the court must approve the verdict. If, on the other hand, the trial court is not satisfied with the verdict, it must grant a new trial. "The trial court's performance of its function as thirteenth juror must be performed without regard to and without deference being shown to the result reached by the jury." An appellate court presumes the trial court properly performed its duty as the thirteenth juror when the trial court approves the jury's verdict without comment. Where, as here, the trial court makes comments regarding the verdict on the record, this Court examines such comments in order to determine "whether the trial court properly reviewed the evidence, and was satisfied or dissatisfied with the verdict." This Court may reverse the lower court's judgment and order a new trial only when the record contains statements that the trial court was dissatisfied with or disapproved of the jury's verdict or when the trial court absolved itself of or misconstrued its function as the thirteenth juror.

*Dickey*, 63 S.W.3d at 718–19 (citations omitted).

I'm referring to pages 2136 through 2144. I've just asked this question: When the jury - - I asked the question: Does the fair market value have to be the exact amount of one of the appraisers or can it be any amount between the highest and lowest amount appraised?

There was a lot of discussion about that question and how it should be answered between pages 2136 and 2144.

Ultimately it was agreed. Even though Mr. Hirsch and Mr. Conner had another thought about how it ought to be answered and they gave their opinion, they were basically, I believe, without having said in so many words, overruled by the people in chairs number 1 for both sides. And it ended up that both Mr. Jackson and Mr. Grant, who I think shared chair number 1 with Mr. Burkhalter, both agreed that we would just re-read the charge beginning with the fourth full paragraph on page 5 through the end of page 5 and the first two sentences of page 6.

If we'd done it a different way, what would have happened? Nobody has to answer that because nobody knows. It might not have made any difference. But everybody agreed that we would do it the way that we did it. So that's history. Everybody stuck by their guns on that issue, and the dice were rolled, so to speak.

We have previously held that the answer given to the jury's question was not error. We do not interpret the court's comments relative to the answer at the hearing on the motion for new trial as "troubling"; the court was addressing an argument made by counsel and the comments were explanatory of the process by which the jury's question was answered.

The second comment was a statement that the court "might disagree" but not "reasonably disagree" with the verdict; MDHA contends that the comments indicate that, in performing its role as thirteenth juror, the trial court deferred to the verdict. The pertinent statement is the following:

Well, as I said earlier, I've looked really carefully at this, at what my job is as thirteenth juror. As I read earlier, even though there is substantial legal evidence which supports a jury's verdict, if the trial judge, acting as thirteenth juror, reasonably disagrees with the jury's verdict and finds that the evidence preponderates against the verdict, he, that's the trial judge, not only may, but must order a new trial.

Goes on to say, if the Circuit Court Judge, in weighing the evidence as the thirteenth juror, is unable to determine whether the evidence preponderates in favor of the verdict, the Judge must order a new trial. A judge has wide

discretion in acting as thirteenth juror on motions for new trial, but he may not [abdicate] his responsibility of independently weighing the evidence.

There is a presumption that the trial judge has complied with his duty as thirteenth juror to independently weigh the evidence when he has granted a new trial or when he has overruled a new trial motion. As you all know, that presumption is rebuttable if I talk too much.

Now, you know, I've really given this a lot of thought. We started working on this Monday. We had a very, very heavy week this week. I worked this thoroughly Monday, part of Tuesday, set it aside and worked on the other matters that were in front of me, and then I reviewed really what I thought were pretty thorough notes that I took during the trial again. I've tabbed them, highlighted them, underlined, and starred them.

You know, I might disagree with what the jury did, but I don't reasonably disagree with what they did. And I do not find that the evidence preponderates against the verdict. I approve the verdict. That's all I'm going to say.

As we consider this issue we are mindful of our role, as succinctly set forth in *Miller v. Doe*:

If called upon to act as a thirteenth juror following the filing of a motion for a new trial, the trial judge simply approves a verdict without any comment, it is presumed by an appellate court that he has performed his function adequately. In the event that the trial court does state his reasons, an appellate court is to examine them only for the purpose of determining whether the trial court properly reviewed the evidence, and was satisfied or dissatisfied with the verdict. However, if in discharging his duty as thirteenth juror, the trial judge makes comments which indicate that he has misconceived his duty or clearly has not followed it, this court must reverse and remand the case for a new trial.

*Miller v. Doe*, 873 S.W.2d 346, 347 (Tenn. Ct. App. 1993) (citations omitted); *see also Sholodge Franchise Sys., Inc. v. McKibbon Bros., Inc.*, 919 S.W.2d 36 (Tenn. Ct. App. 1995).

We do not equate the court's statement that it "might disagree with what the jury did, but [not] reasonably disagree with what they did" with dissatisfaction with the verdict for purposes of granting a new trial. Many times a court may disagree with a jury's verdict in the sense that the court would have ruled another way; dissatisfaction means that the court has determined that the verdict is not supported by the evidence, was reached in an improper manner, or otherwise works an injustice. Such dissatisfaction is not present in the court's

comments here; there is nothing in the remark from which we could conclude that the court misconstrued its role as thirteenth juror or failed to follow it. Being satisfied that the verdict was supported by the evidence, the court properly overruled the motion.

III. CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
RICHARD H. DINKINS, JUDGE