MEMPHIS HOUSING AUTHORITY, Appellant, v. MID-SOUTH TITLE COMPANY, Trustee, et al., Appellees (five cases).—443 S.W.2d 492.

Western Section. February 28, 1968

Certiorari Denied by Supreme Court August 5, 1968

Rehearing Denied by Supreme Court September 16, 1968.

Second Petition to Rehear Denied by Supreme Court December 16, 1968.

Cochran, Carey, Fleischer & Mullikin, Memphis, for appellant.

Apperson, Crump, Duzane & Maxwell, Memphis, for appellees.

CARNEY, J. The Memphis Housing Authority has appealed from five judgments of the Circuit Court of Shelby County, Tennessee, based on jury verdicts, totalling $436,430 arising out of the condemnation by the Memphis Housing Authority of five separate parcels of land located in downtown Memphis, Tennessee. The date of the taking was September 9, 1966.

The five parcels were all in the block immediately north of Ellis Auditorium. The total area of the five parcels was 43,600 square feet. The $10.00 per square foot value set by the jury was the lowest value given by landowners' witnesses who were real estate men. There were five separate condemnation suits but the cases were consolidated for trial and tried to the same jury. The beneficial interests in the five lots were owned by various individuals. The owners of the several lots had entered into a written agreement in 1958 and obligated themselves to develop their separate pieces of property as an assemblage.

We list the verdicts of the jury as follows:

(1) Lot No. 1—Case No. 5910—Owned by E. R. Ferguson, containing 17,887 square feet—$178,870.00

(2) Lot No. 2—Case No. 6172—Generally referred to as the King Solomon Lodge lot owned by Ferguson, Schadt, and Guaranty Mortgage Company, Trustee—2,276 square feet—$22,670.00

(3) Lot No. 3—Case No. 5908—Owned by Harry E. Schadt, Jr. and Mid-South Tile Company, Trustee —7,416 square feet—$74,160.00

(4) Lot No. 5—Case No. 5909—Owned by Harry E. Schadt, Jr.—7,905 square feet—$79,050.00

(5) Lot No. 6—Case No. 5989—Owned by Guaranty Mortgage and Trust Company as trustee for Great Mountain College—8,168 square feet— $81,680.00. This is an educational trust created by Mr. R. M. Metcalf. The college is still in the planning stage.

Defendant-appellees relied upon the testimony of four experienced real estate brokers and developers to establish the value. Mr. Russell Wilkinson of Memphis, Tennessee, placed a value on the condemned property at from $10.00 to $12.00 per square foot. Mr. Sam Dattel who was then in the process of constructing a department store and high rise apartment building some few blocks south of the condemned property in the downtown shopping area placed a value of from $11.00 to $12.00 per square foot on the subject property. Mr. Dattel had worked an assemblage of the property for the construction of the department store and high rise

apartment building at a cost of $24.00 per foot but he already had a contract for the rental of the department store upon the completion of the building. Mr. Jeff Pratt, a real estate agent who had served as agent for some of the appellees in purchasing the property, placed a valuation of $15.00 per square foot and Mr. R. M. Metcalf, Jr., an official of Guaranty Mortgage and Trust Company who had purchased and conveyed lot No. 6 to the Guaranty Mortgage and Trust Company in trust, placed the range of value between $12.00 and $13.00 per square foot.

The appellant, Memphis Housing Authority, relied upon the testimony of only two witnesses for expert testimony as to the value of the lots. One witness, Mr. D. Frank Crouch, placed a value of $5.34 per square foot for a total of $233,193 and Mr. William W. Harris placed a valuation of $5.49 per square foot for a total of $238,-650. The Memphis Housing Authority had paid into court the sum of $240,174 upon filing of the petitions for condemnation. A jury of view of Memphis real estate men set a total value of $392,868 on the property involved in this litigation.

One of the real estate developers, Mr. Metcalf, became interested in the real estate located around Ellis Auditorium about 1956 when there was a two million dollar addition being made to Ellis Auditorium and the news was being generally noised abroad and possibly publicly announced that a new bridge across the Mississippi River was being proposed to be located within a very short distance north and west of Ellis Auditorium. It was also public knowledge that a great amount of interstate traffic would be directed across the Mississippi River

both east and westbound in this area via Interstate 40. Mr. Metcalf enlisted the aid of other persons interested in real estate and they set about to acquire as much of the block immediately north of Ellis Auditorium as they could. They were unable to procure all of the lots within the block but they did procure more than half of the block. The purchase price of the lots ran from $2.00 to $3.00 per square foot. Mr. Metcalf had in mind at that time the erection of a motel on this property because of its close proximity to the proposed new bridge and expressway.

About 1957 the Memphis Housing Authority started getting title to all of the real estate north of Adams Street which included the Ellis Auditorium area under a project known as the Court Avenue Urban Renewal Project or Memphis Civic Center. The block of land immediately north of Ellis Auditorium, most of which was owned by the appellees herein, was excluded from the project upon the assurance by Mr. Metcalf to officials of Memphis Housing Authority that it was their firm intention to build a high rise motel within the block immediately north of Ellis Auditorium. Plans went forward for the building of the bridge across the Mississippi River and the construction of Interstate Highway 40. The contract was let for the construction of the bridge with the completion date scheduled for December 31, 1972.

Appellees made no detailed plans for the construction of the motel because the scheduled date of completion of the bridge was far off and a great portion of the patronage for the motel would, of course, be expected to come from interstate traffic. Meanwhile several new buildings

were constructed within the Civic Center such as the new Federal Building, the new Memphis City Hall, the Tennessee State Office Building, and possibly others. Sometime prior to September, 1966, officials of the Memphis Housing Authority and/or the City of Memphis determined that the block north of Ellis Auditorium should be included in the Court Avenue Urban Renewal Plan and used for the construction of an Exhibition Hall to attract more conventions to Memphis. For this reason the appellees' property was brought within the urban renewal project and the petitions for condemnation filed in the five cases above described.

On the trial below appellees contended that the highest and best use of the property condemned was for a high rise motel. They introduced an architect's plans for a nine-story motel containing 245 rooms for rental with parking for 195 cars on three floors of the proposed motel. These plans were drawn after the suits were filed for the primary purpose of being used as evidence on the trial. These plans were admitted in evidence over the objections of Memphis Housing Authority. Apellees also contended that the lots were adapted for erection of an office building.

Lots 1 and 2 were contiguous and formed one large lot which fronted 148 feet along the south side of Market Avenue. Market Avenue runs east and west and is 66 feet wide. The west side of the lot was 148 feet and bounded on the west by a 24-foot alley. The south side of the lot was 149 feet and was bounded on the south by a 16.5-foot alley. The east side of the lot fronted on Main Street for a total length of 124 feet but there was a lot carved out of the center running back 90 feet in depth which fronted 24.5 feet on Main Street and which was

not owned by any of the appellees. The northeast corner of lot No. 3 was immediately west and across the alley from the northwest corner of lots 1 and 2. This lot fronted 49.8 feet along the west side of the 24-foot alley, fronted 148.5 feet along the south side of Market Street, 49.8 feet along the east side of Front Street, and was bounded on the south for a distance of 148.5 feet by a lot not owned by any of the appellees. The southeast corner of lot No. 5 was directly west of the southwest corner of lots 1 and 2 and fronted 53.5 feet on the west side of the 24-foot alley and the northern margin of lot No. 5 was 148.5 feet along the south margin of a 46-foot lot not owned by any of the appellees situated between lots 3 and 5. Lot No. 5 fronted 52.9 feet on Front Street and the southern boundary of lot No. 5 was the northern boundary of a 16.5-foot alley which was also the southern boundary of lots 1 and 2.

Lot No. 6 was immediately south of lot No. 5 but separated by the 16.5-foot alley. It, too, fronted 55 feet along the west side of the 24-foot alley, 148.5 feet along the south margin of the 16.5-foot alley, fronted 55 feet along the east side of Front Street. The southern border of Lot No. 6 marched for a distance of 148.5 feet continuously with other property not owned by any of the appellees and not involved in this condemnation.

It was the contention of the Memphis Housing Authority that a nine-story high rise motel as planned by the appellees on the property in question would not be economically profitable. Memphis Housing Authority offered proof to show that the rental value of land and buildings devoted to motel use amounted to twenty-five percent of anticipated revenue from room rentals, five

percent of the sale of food and beverage and further offered to prove the anticipated room revenue and food and beverage sale. The Housing Authority proposed to make this proof by one experienced in the motel business. The resulting computation based on the formula above stated would have shown the nine-story motel as proposed by the appellees to be economically unfeasible. The Trial Court excluded the appellant's offer of proof along this line. The exclusion of this evidence is basis of assignment of error No. I by the appellant.

Assignment of error No. II complains of the action of the Trial Judge in excluding evidence as to the price paid for three separate tracts or parcels of real estate in the Memphis area which were being used for the erection of motels.

Assignment of error No. III assails the action of the Trial Judge in admitting into the evidence exhibits 10 and 11 which were pictures published by the Memphis Housing Authority some several years prior to the filing of the condemnation suits in the present cause. These pictures show the urban renewal area or Civic Center which included the land involved in this litigation.

These exhibits 10 and 11 published by the Memphis Housing Authority purported to show the Court Avenue Urban Renewal Area (Civic Center) after completion of the entire project. Exhibit 10 is on slick photographic paper and shows not only the buildings that were then in existence and were to remain such as churches, the Ellis Auditorium, the Shelby County Courthouse, Shelby County Criminal Courts Building, but also showed artists' drawings of proposed new buildings such as the Federal Courthouse, City Hall, and many, many other

buildings which might be erected in days to come. Exhibit 10 was entitled "Illustrative Plan of Redevelopment, Birds-Eye View—Project I, Court Avenue Urban Renewal Area (Civic Center)—Memphis, Tennessee." This photograph shows the proposed Interstate 40 as it approaches the Mississippi River immediately north of the area involved in this litigation. In the picture there is projected an artist's drawing of a multistory motel on the entire block of land just north of Ellis Auditorium. This block included not only the five parcels condemned herein but all the remainder of the block not owned by appellees.

Exhibit 11 is a brochure prepared by the Memphis Housing Authority entitled "What can Urban Renewal do for Memphis." This brochure recited that it was designed to acquaint the citizens of Memphis with urban renewal, its challenge and its progress to date. Material contained in the booklet covered the five years since the first land acquisition was begun in July, 1957, through May 15, 1962. The brochure listed the various phases of urban renewal as follows: (a) Downtown; (b) Jackson Avenue; (c) Railroad Avenue; (d) Riverview; (e) Court Avenue; (f) Medical Center. Pictures of new buildings under construction and proposed in the several areas of renewal are contained in the booklet. Among the pictures shown under the Court Avenue Renewal Project in the brochure is a copy of Exhibit No. 10 described above though much reduced in size. However, Ellis Auditorium is plainly to be seen in the picture and a proposed high rise motel is shown on the block immediately north of Ellis Auditorium which includes the five parcels of land involved in this condemnation proceeding.

Assignment of error No. IV avers that the Trial Court erroneously admitted in evidence exhibit No. 22 which was the plans for the motel prepared by the architect after the condemnation suits were filed.

Assignment of error No. V insists that His Honor the Trial Judge erred in not granting a new trial because the verdict was so excessive as to indicate prejudice or some other improper basis or reason for the verdict.

We find no merit in assignment of error No. V. Assuming that there was no error by the court in rejecting appellant's evidence or in admitting evidence over appellant's objections, there was ample evidence from which the jury could reasonably have found the value of the property involved in this condemnation to have been $10.00 per square foot as of the date of the taking.

It is the contention of appellants in support of assignment of error IV that the admission of the plans for the motel in evidence was in direct conflict with the recent case of Davidson County Board of Education v. First American National Bank, 202 Tenn. 9, 301 S.W.2d 905 (1957). The attention of the Trial Judge was directed to this case upon the trial below when the appellant objected to the admission into evidence of the exhibit No. 22. After full discussion His Honor the Trial Judge was of opinion that the Davidson County case was not controlling because in the present case solicitors for appellant were denying the feasibility of the erection of a motel on the proposed assemblage.

In Davidson County Board of Education v. First American National Bank (1957), 202 Tenn. 9, 301 S.W.2d 905, the Board of Education had sought to condemn 16 acres of farmland out of a 52-acre tract for the erection

of a school building in Davidson County. The Trial Judge refused to admit in evidence a plat prepared by an engineer dividing the land into lots of a subdivision. The subdivision had not been in existence prior to the condemnation proceeding. The plat had been prepared by an engineer witness for the express purpose of illustration and persuasion in connection with the condemnation proceedings. The Court of Appeals reversed holding that the plat was properly admissible in evidence. Our Tennessee Supreme Court granted certiorari and in an opinion by Justice Burnett (now Chief Justice) affirmed the action of the Trial Judge in refusing to admit said plat in evidence. Chief Justice Burnett reviewed and approved the holding of Alloway v. City of Nashville, 88 Tenn. 510, 13 S.W. 123, 8 L.R.A. 123, that in Tennessee the fair market value in view of all available uses of the property being condemned prevails. From Chief Justice Burnett's opinion in Davidson County Board of Education v. First American National Bank we quote at length as follows:

"The author of Orgel On Valuation, supra, in Section 30, on page 146 makes this very pertinent statement:

'The courts are unanimous in admitting testimony on the adaptability of property for this use and for that, save for the familiar restrictions against the consideration of highly "remote and speculative" contingencies. But it has been held in most cases that a witness may not himself translate that adaptability into a statement of its money value. A properly qualified witness may express an opinion that the property has a "fair market value" of $10,000, and he may explain, both on direct and on cross examina-

tion, the particular qualities of the property which lead him to conclude that it is worth this amount. But he is not ordinarily permitted to testify that the property "has a value of $10,000 for building lot purposes" or "for the best use".'

When we read the Alloway case, where the proper question is stated on page 515 of 88 Tenn., on page 123 of 13 S.W., as to what a witness should be asked as to the value of property we find that the above summary fits our holding.

As is said further on page 149 of the same work last above quoted from:

' * * * the apparent aim of the courts in employing the "all available uses" formula is to avoid overvaluation by preventing the jury from giving excessive weight to the value for the purposes for which the property is being condemned.'

This was the ascribed reason of the trial judge for sustaining the objection to the admission of this plat and the evidence based thereon. We think clearly under reason and authority herein cited that the trial judge was eminently fair and correct in his reasons and conclusion.

This rule which is in effect in Tennessee is the majority rule. All available uses and not the value for a particular use rule meets the approval of this author, Orgel, above quoted from. He says in commenting on it that the jury 'is likely to strike some rough average between the higher and lower figures at which it believes that the property might be sold for various purposes.' Clearly this and this reasoning meets our

yardstick as to the values of property being condemned.

The Supreme Court of California in Sacramento Southern R. Co. v. Heilbron, 156 Cal. 408, 412, 104 P. 979, 981, have to our minds best expressed what we are here considering. We quote and adopt as the rule to be followed in this State the following succinct statement from the California Court:

'It is seen, therefore, that this court by its latest utterances has definitely aligned itself with the great majority of the courts in holding that damages must be measured by the market value of the land at the time it was taken, that the test is not the value for a special purpose, but the fair market value of the land in view of all the purposes to which it is naturally adapted; that, therefore, while evidence that it is "valuable" for this or that or another purpose may always be given and should be freely received, the value in terms of money, the price, which one or another witness may think the land would bring for this or that or the other specific purpose is not admissible as an element in determining that market value, for such evidence opens wide the door to unlimited vagaries and speculations concerning problematical prices which might under possible contingencies be paid for the land, and distracts the mind of the jury from the single question —that of market value—the highest sum which the property is worth to persons generally, purchasing in the open market in consideration of the land's adaptability for any proven use.'

We think that this concise statement is exactly what this Court meant in the Alloway case, supra, because property really has but one market value; it did not have a value for one use and another for another but in condemnation it has one and only one market value which may be arrived at by the questions as set forth in the Alloway case and the eliciting of answers from the expert witnesses on different things as we have heretofore herein shown. When it is looked at from this standpoint it is clearly obvious to us that this map (it was for the purpose of this litigation) was inadmissible. But the witnesses may be asked and may state as hereinbefore shown how they arrive at various and sundry values of the property, its damages and benefits, etc. In further comment on this question we take a statement from the Supreme Court of Pennsylvania in Pennsylvania S. V. R. Co. v. Cleary, 125 Pa. 442, 17 A. 468, 470, as follows:

'The jury are to value the tract of land and that only. They are not to determine how it could best be divided into building lots, nor to conjecture how fast they could be sold, nor at what price per lot. A speculator or investor, in deciding what price he could afford to pay, would consider the chances and probabilities of the situation as then actually existing. A jury should do the same thing. They are not to inquire what a speculator might be able to realize out of a resale in the future, but what a present purchaser would be willing to pay for it in the condition it is now in.'

This statement has been adopted and approved by the Third Circuit United States Court of Appeals in

United States v. 3,544 Acres of Land, 3 Cir., 147 F.2d 596, 598, as well as by the Supreme Court of Utah in State v. Tedesco, 4 Utah 2d 248, 291 P.2d 1028.

In the Alloway case above this Court, fifty years ago said:

'In determining the market cash value, you cannot single out from the elements of general value the value for an especial purpose; but you are to consider all the constituent elements that make up the market value,—its availability, adaptability, and capability for different uses and purposes.' (88 Tenn. 510, 13 S.W. 124.)

This statement from the Alloway case is exactly what we have been trying to elaborate on heretofore and what as we conceive the trial judge held in excluding the plat herein. The proof herein as offered by both sides showed the potential use of this land for residential subdivision purposes and was an element that the jury could consider. Its location and the history of the surrounding area was taken into consideration and was offered as evidence before the jury by both sides. The conflict of course comes wherein the property owner attempts to introduce this map and to hinge its proof on the value of this piece of land purely for the one purpose as that of a subdivision. In so doing we think that this is not admissible.''

In the five cases at bar His Honor the Trial Judge admitted the drawings and plans of the architect for a nine-story motel on the lots under condemnation solely because the defendant, Memphis Housing Authority, was questioning the ''feasibility'' of erecting a high rise motel on the property.

Webster's New International Dictionary, Second Edition, Unabridged, gives the following definitions of feasible:

"1. Capable of being done, executed, or effected; possible of realization; as, your plan seems feasible; hence, successful in operation.

2. Capable of being managed, utilized, or dealt with successfully; suitable; as, to find Nice feasible for an invalid.

3. Likely; probable; reasonable."

Memphis Housing Authority contends that since lots 1 and 2 were separated from lots 3, 5, and 6 by the 24-foot alley and lots 5 and 6 were separated from each other by the 16-foot alley and lot 3 was separated from lot 5 by the 46-foot strip of land owned by other persons, that said lots were so located that they were not reasonably and conveniently adaptable for use as a modern multistory motel. Also the Memphis Housing Authority contended that if all five of the lots were joined by bridging the 24-foot alley at the second story level, such bridging would increase the cost of the motel to such an extent as to make it financially unprofitable for the operation thereof.

His Honor the Trial Judge was of opinion that Davidson County v. First American National Bank, supra, did not apply because in Davidson County there was no disagreement between the parties that the real estate being condemned was subject to being used for residential subdivision purposes whereas in the cases at bar the Memphis Housing Authority was contending that the five lots were not reasonably adaptable for use for the construction of a motel. He therefore allowed the

introduction of the plans and drawings of the architect, Mr. George Thomason, for the sole purpose of proving adaptability and not for the purpose of proving value of the lots. Mr. Thomason had drawn plans for about twenty Downtowner Motels in the past six years.

The original exhibit No. 22 was brought up with the record and we have examined it carefully. It consists of seven sheets of drawings and plans on paper of the size and type regularly used by architects for such purpose. The first page shows a drawing of the five lots with relation to each other, to the streets of Memphis, and to the alleys. It is entitled "Plot Plan" and in larger letters "Motor Inn, Shops, and Offices for Memphis, Tennessee."

Basically the plans called for the erection of three separate buildings to be connected by bridges over the 24-foot alley. Lot No. 3 was to be used for shop rental and to contain the swimming pool. This building was to be only one or one and one half stories high. Lots 5 and 6 were shown to be designated for parking area for the first three floors with a drive-up ramp and deck which completely bridged over and covered the 16.5-foot alley between lots 5 and 6. Floors four through nine over lots 5 and 6 contained rental units under the title Wing B. These units were to overlook the river.

The main building or Wing A was to be erected on lots 1 and 2. The first floor contained shops, offices, coffee shop, lobby and some parking area. Rental rooms were shown on floors two through eight. The ninth floor of Wing A was designated as club rooms, dining room, kitchen, meeting rooms, and lobby. Wing B located on lots 5 and 6 was connected with Wing A by a walkway across the 24-foot alley.

It must be remembered that the completion date of the bridge over the Mississippi River was projected for December, 1972. A large portion of the patronage which a motel would receive on this property would be from traffic on Interstate 40. At the time of the taking on September 9, 1966, the appellee landowners had no immediate plans for the erection of a motel on this property. Every indication was that they were waiting until the completion of the new bridge across the Mississippi River and the completion of the expressways and Interstate 40 leading up to the bridge were closer at hand before any affirmative action would be taken for the erection of a motel on the property by lease or otherwise.

Under the rules given by Chief Justice Burnett in Davidson County Board of Education v. First American National Bank, supra, the jury could not determine the value to the owners or any other person of the five lots for use as a motel; nor could they set the value of the property on the basis of their utility to the condemning authority nor on the basis of their utility to the owners. The jury was required to set the fair market value of the lots on the day of the taking after a consideration of all the uses for which they were reasonably adaptable and to set the market price as being that amount which a willing purchaser would pay a willing seller for these lots as an assemblage in the condition in which they were on the day of the taking.

In the Davidson County case Chief Justice Burnett also quoted with approval a statement from Orgel On Valuation under Eminent Domain, 1953, the following statement: "* * * and it is no less obvious to anyone familiar with the nature of capital value, that the pro-

spective uses must be fully discounted both for futurity and for the risk that they may not materialize."

We agree with His Honor the Trial Judge that the appellees were entitled to prove the feasibility of erecting a motel on their property since the Memphis Housing Authority denied that the property was so adaptable. However, we are of opinion that it was not necessary or proper for Mr. Thomason to present in evidence nor testify about plans for a nine-story motel costing two and one-half million dollars in order to make out a prima facie case of the adaptability of the five lots for use as motel property. In our opinion the rules given by Chief Justice Burnett for the exclusion of the plat of the subdivision in the Davidson County case apply equally as well to the exclusion of the plans drawn by Mr. Thomason to be used as a part of his testimony in the cases at bar. We think the result of the introduction of the plans of a nine-story motel including shops, offices and swimming pool was to over-emphasize in the mind of the jury the value of the lots to the owners for motel purposes. Consideration of such value by the jury is forbidden under the opinion of Chief Justice Burnett in the Davidson County case. The Memphis Housing Authority made no contention that a motel could not be physically built upon the five lots. It only contended that the cost of bridging the alleys at the height required by city regulations would make the cost too high for profitable operation of a motel. The jury could determine the issue of the adaptability of the lots for motel purposes in the abstract without the necessity of being shown plans for a nine-story motel drawn up by an architect after the condemnation suit had been brought. It was error for the Trial Judge to admit the plans contained in Exhibit

22 in evidence and assignment of error No. IV is sustained.

█ For the same reason we hold it was error to admit in evidence exhibits 10 and 11. These pictures were published by Memphis Housing Authority several years prior to the filing of the condemnation suits showing a proposed high rise motel unit on the block of land in which the five lots were located. The pictures are subject to the same objection as the architect's plans for the nine-story motel unit. They over-emphasized in the minds of the jury the adaptability and utility of the lots in question to the owners for use as motel property. The pictures do not represent or portray the true status of the property at any time. They are in part photographs of existing buildings and in part artists' drawings of buildings that may be erected within the civic area.

The proposed high rise motel drawn by the artist is shown as covering the entire city block north of Ellis Auditorium which covered not only the five lots owned by the defendant landlords but property owned by other persons not involved in this litigation. The defendant landowners in the present case could have offered evidence that the Memphis Housing Authority had previously committed itself to the adaptability of the five lots for motel purposes and had published pictures showing a motel on the lots being condemned. It was not necessary to introduce the pictures themselves unless the Memphis Housing Authority should deny the publication of such pictures. In the event of such denial then it would seem that the pictures would probably be admissible. In the present case no such denial was forthcoming. We hold that the pictures themselves were prej-

udicial to the rights of the Memphis Housing Authority in the present case and that His Honor the Trial Judge was in error in admitting them in evidence. Therefore, assignment of error No. III is sustained.

■■ Since we have held that it was inadmissible for the owners to prove plans for a nine-story motel on the five lots in this litigation and that it was inadmissible to prove the value of the lots for any specific purpose such as the use for a motel, we think it follows that under the authority of Davidson County Board of Education v. First American National Bank it was inadmissible for the condemnor, Memphis Housing Authority, to prove the purchase price of the three separate tracts or parcels of real estate in Memphis which had been used for the erection of motels since the properties purchased were located from one to three miles from the site of the five lots condemned in the present case. Assignment of error No. II is therefore overruled.

■ For the same reasons we hold that it was not admissible for Memphis Housing Authority to prove that the rental value of land and buildings devoted to motel use amounted to twenty-five percent of anticipated revenue from room rentals and five percent of the sale of food and beverages and inadmissible to prove what would be the anticipated room revenue and food and beverage sales in the operation of the proposed nine-story motel. Assignment of error No. I is therefore respectfully overruled.

■ The expert witnesses in the case all gave their opinions as to the value of the property taken based on a consideration of all its adaptable uses as was proper. However, so much emphasis was placed by both parties

and by some of the expert witnesses upon the value of the five lots for use as a motel we hold that the verdict of the jury was probably influenced to a degree by the jury's consideration of the value of the lots to the owners for motel purposes. The value of the lots to the owners and the fact that the condemnation deprived them of the right and opportunity to build a motel on these lots in futuro are not properly to be considered by the jury in determining the market value of the property condemned. Under Alloway v. City of Nashville, and Davidson County Board of Education v. First American National Bank the jury must determine the market value of the condemned property as of the day of the taking based on a consideration of all the uses for which the property is reasonably adaptable and based on what a willing purchaser who did not have to purchase would pay a willing seller who was not forced to sell.

Mr. Mervyn Smith, vice president of Allen Bros, and O'Hara, Contractors, with broad experience in building motels for Holiday Inns, Inc., testified as a witness for the landowners that he had studied the plans drawn by Mr. Thomason, exhibit No. 22, and that in his opinion the multistory motel as projected by the plans would cost $2,400,000. Mr. William Bond, Architect, testified as a witness for the Memphis Housing Authority that he had designed about five hundred motels throughout the United States most of which had been for Holiday Inns of America; that he had studied the plans shown as exhibit No. 22 and that because of the extra expense of getting sufficient height on some of the floors to meet the minimum requirements of the City of Memphis for bridging alleys each rental unit would run approximately $13,000 and that the nine-story motel could not be oper-

ated successfully at $10.50 per room rental which was the prevailing rate in the Memphis area. Solicitor for the landowners at first objected and then later withdrew his objection to the admissibility of this evidence.

The judgments below are reversed and the cases remanded for a new trial. The costs of this appeal will be taxed against the appellee landowners. The costs in the lower court will abide the judgment on the second trial.

Avery and Bejach, JJ., concur.