IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 13, 2016 Session

## OCOEE UTILITY DISTRICT OF BRADLEY AND POLK COUNTIES, TENNESSEE v. THE WILDWOOD COMPANY, INCORPORATED

**Direct Appeal from the Circuit Court for Bradley County**
**No. V-13-746       Lawarence Howard Puckett, Judge**

---

**No. E2016-00382-COA-R3-CV-FILED-OCTOBER 6, 2016**

---

This appeal involves the condemnation of property by a utility district. The trial court entered an order of possession vesting title of the property in the utility district and reserved the issue of just compensation for a jury trial. Prior to trial, the utility district filed a motion in limine seeking to exclude the expert appraisal and testimony of the landowner's expert witness. The trial court permitted the expert to testify over the objections of the utility district. At the conclusion of the three-day jury trial, the jury returned a verdict of $417,000 for the seven-acre parcel at issue, which was the same value suggested by the landowner's expert witness. After the trial court denied the utility district's motion for a new trial, the utility district timely filed a notice of appeal. The utility district maintains on appeal that the trial court erred by failing to exclude the testimony of the landowner's expert witness, and it also argues that the jury verdict is not supported by material evidence. We vacate the judgment of the trial court and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Vacated and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and THOMAS R. FRIERSON, II, J., joined.

Benjamin A. Gastel, Donald Lee Scholes and James Gerard Stranch, III, Nashville, Tennessee, for the appellant, Ocoee Utility District of Bradley and Polk Counties, Tennessee.

Bradford Grant Harvey, Chattanooga, Tennessee, for the appellee, The Wildwood Company, Incorporated.

# OPINION

## I. FACTS & PROCEDURAL HISTORY

Ocoee Utility District of Bradley and Polk Counties, Tennessee ("the Utility") is a utility district that operates a water and sewer system in Bradley and Polk Counties. The Wildwood Company, Inc. ("Wildwood") is a private fishing club with eleven member-stockholders. For decades, Wildwood owned about 120 acres of land in Bradley County, which included wetlands, a lake, and a nearby freshwater spring. The spring produced more water than Wildwood needed, and a diversion ditch was created so that the lake would not receive too much water. Around 1979, a representative of Wildwood showed representatives of the Utility the amount of water that was being diverted around the lake. The Utility was in need of new sources of water and proposed that the parties enter into a lease agreement allowing the Utility to access the land and utilize the excess spring flow. In 1981, the parties signed a long-term lease allowing the Utility to rent a five-acre portion of Wildwood's land and withdraw water from the spring. The lease payments began at $300 per month and were adjusted annually in accordance with an inflation index. At some point, the parties lost or misplaced the 1981 lease, but they continued to operate under its provisions. Over the years, the Utility constructed a pumping station and filtration system on the property for withdrawing and filtering the water.

In 2006, the general manager of the Utility, Tim Lawson, sent a letter to Wildwood explaining that the Utility was evaluating its water supply and exploring the possibility of expanding its water treatment plant on Wildwood's property. The letter explained that the Utility would need to dig and test additional wells on the property and, if successful, construct additional pipelines and buildings. The letter suggested that the parties first reach an agreement regarding the test wells and then negotiate a new long term lease.

Wildwood allowed the Utility to dig the test wells, which were successful. Around 2009, the parties began the process of negotiating a new long term lease. Approximately twelve drafts of proposed lease agreements were created. In 2012, Wildwood voted to approve the latest version of the proposed lease agreement and delivered a copy of it to Lawson, the general manager at the Utility, so that he could present it to the Utility's board of commissioners for approval.[1] However, before the Utility's board met to consider the proposed lease, Wildwood received a letter from an attorney retained by one its members raising various concerns about the proposed lease. As a result, on June 6, 2012, the president of Wildwood sent a letter to Lawson at the Utility notifying him of Wildwood's desire "to withdraw the proposed contract due to

---

[1]According to Lawson's trial testimony, the Utility is a governmental entity that formally acts only through official votes of its board of commissioners at public meetings.

concerns regarding legal action from a shareholder." The letter stated that Wildwood was working to remedy the situation and was confident that it could "re-present the contract" in the near future. On June 27, 2012, Lawson responded with a letter stating that he had informed the Utility's board of the development and that they were eagerly awaiting resolution of the matter.

Six months later, on January 14, 2013, the Utility sent a letter to Wildwood offering to purchase the property outright for $35,000. The Utility attached an appraisal of the property valuing it at only $21,500. The letter notified Wildwood that if it did not accept the Utility's offer, the Utility would begin the process of acquiring the property through eminent domain. Wildwood rejected the Utility's offer.

On October 10, 2013, the Utility filed a petition for condemnation to acquire fee simple title to a 7.39-acre tract of property belonging to Wildwood in order to expand the operation of its water treatment plant. The 7.39-acre tract does not include the lake but does encompass the location of the spring. The Utility deposited with the court clerk the sum of $21,500, which the Utility claimed was the amount of compensation to which Wildwood was entitled for the condemned property. Wildwood filed an answer demanding compensation "for the value of the surface land taken, and the value of water available below the surface of the land being taken," which, according to Wildwood, was "substantially in excess of the amount tendered."[2]

The trial court entered an order of possession on March 5, 2014, finding no valid objection to the Utility's right to condemn the property for the extension and improvement of its water system. The order reserved the determination of the amount of just compensation for the taking.

Each party retained an appraiser to value the condemned property. In May 2015, the Utility filed a motion in limine seeking to exclude the expert report and testimony of Henry Glasscock, the appraiser retained by Wildwood. The Utility claimed that Glasscock's appraisal of the property violated fundamental rules for evaluating the "fair market value" of property in an eminent domain proceeding. Specifically, the Utility argued that it is inappropriate for an appraiser to value a condemned property based solely on its use for a particular purpose or its "highest and best use." The Utility asserted that Glasscock's analysis overemphasized a single use of the property and valued the property solely and exclusively based on the Utility's use of the property as a water source. The Utility argued that Wildwood was not entitled to an enhanced value of the property based on its particular importance to the condemnor. It also argued that Glasscock erred in valuing the water on the property rather than the property itself.

---

[2]By this time, the Utility's monthly payments under the 1981 lease had increased to $712 due to inflation.

In support of its motion in limine, the Utility submitted Glasscock's appraisal report and deposition testimony, which indicated his opinion that the highest and best use of the Wildwood property was for the sale of water. Glasscock's valuation of the property involved "an analysis of the present value of future income derived from water sales." Glasscock estimated the landowner's annual net operating income from the sale of water from the condemned property at $25,000 by estimating the price of water and multiplying it by the amount of water the Utility anticipated using from the property.[3] He determined that a low capitalization or risk rate of 6% was appropriate because the Utility was "ready to sign" a long-term lease of the property before Wildwood withdrew its consent to it. Applying this risk rate to the estimated annual rental income, he reached an overall value of the property of $417,000 (presumably calculated as $25,000/.06 = 416,666).

Wildwood filed a response in opposition to the motion in limine, arguing that Glasscock considered all possible uses for the property and did not overemphasize the use for which the property was taken. Wildwood claimed that Glasscock valued the land rather than the water and applied methods that were appropriate under Tennessee law.

The trial court did not rule on the motion in limine prior to the jury trial, which was held over the course of three days in October 2015. The trial court heard testimony from Thomas Hopper, the president of Wildwood; Tim Lawson, the general manager of the Utility; Weyman Dooly, a member of Wildwood and former board member of the Utility; and Henry Glasscock, the expert appraiser retained by Wildwood.[4]

At trial, counsel for the Utility continued to argue to the trial judge that it is inappropriate for an expert to base a real estate appraisal solely on the basis of the highest and best use of the condemned property. Just before Glasscock was called to testify, the Utility orally moved to renew its motion in limine to exclude his testimony in its entirety. The Utility argued that Glasscock based his entire valuation opinion on the Utility's need for the property in question and its water source. The trial court said he would "let the expert testify and we'll do what we have to do as it comes in."

Glasscock is a commercial real estate appraiser. He testified that he considered

---

[3]Specifically, Glasscock's report stated, "The Ocoee Utility District states that a typical value for wholesale water sales in the state of Tennessee ranges from $.07 to $.10 per 100[0] gallons. Currently, OUD is drawing 600,000 to 800,000 gallons of water per day which would translate into an approximate annual income of $25,000." Glasscock determined the price of water and the amount of water that the Utility anticipated using based on statements made and documents produced by the Utility during the failed lease negotiation process and deposition testimony of the Utility's general manager.

[4]The appraiser retained by the Utility did not testify at trial, but his appraisal report was included among the exhibits submitted at trial.

Wildwood's present use of the property in his analysis and concluded that Wildwood was using the property at its highest and best use by renting it for the pumping of water. Glasscock testified generally about various possible approaches for valuing property and said that he chose the income approach for valuing Wildwood's property in this case. He explained that the income approach "analyz[es] rental income" using a simple equation to arrive at the fair market value, and this approach is normally used for properties that are purchased for their rental potential. Glasscock generally described how he normally reaches a conclusion about a fair rental rate for a property and then turns that number into a value by applying a "risk rate" or capitalization rate. Glasscock said that he applied his usual income approach when appraising Wildwood's 7.39-acre property, and he concluded that its value was $417,000. However, he did not state what rental rate or capitalization rate he used in his underlying calculation to reach this figure, and his appraisal report was not admitted into evidence. Glasscock simply said, "I took what I thought was a very reasonable rental income, I turned it into a value." Glasscock conceded that he referenced the "sale of water" in his appraisal report when determining the reasonable rental rate to use in his calculation. Glasscock acknowledged that his "rental rate is based on water" and opined that "[y]ou're buying the right to the water." The Utility then renewed its previous objection and moved to strike all of Glasscock's testimony, but the trial court ruled, without further argument, "I'm going to let him testify. Go ahead."

The Utility moved for a directed verdict at the close of Wildwood's proof, arguing that the jury heard no competent evidence to support Glasscock's estimation of the value of the property at $417,000 because he did not explain how he arrived at that particular figure. The trial court denied the motion. After very brief additional testimony from the general manager of the Utility, the jury heard the jury instructions and the attorneys' closing arguments. The jury returned a verdict of $417,000 as the fair market value of the 7.39-acre tract, and the trial court entered judgment on the jury verdict.

The Utility filed a motion for new trial, arguing, among other things, that Glasscock's analysis overemphasized a single use of the property, that being the particular use of the property by the Utility as a source of water. The trial court denied the motion for new trial, and the Utility timely filed a notice of appeal.

## II. ISSUES PRESENTED

The Utility presents the following issues for review on appeal:

1.      Did the trial court err by failing to grant the Utility's motion in limine seeking to exclude Wildwood's real estate appraiser expert because his opinion on valuation violated the *Davidson County* Rule

by valuing the land for a particular purpose?

2.       Did the trial court err by failing to grant the Utility's motion in limine seeking to exclude Wildwood's real estate appraiser because his opinion on valuation was based on the value of water?

3.       Did the trial court err by allowing Wildwood's real estate appraiser expert to rely on data that was irrelevant in formulating his opinion?

4.       Is the jury verdict supported by the evidence?

In its posture as appellee, Wildwood raises the following additional issues:

5.       Whether the Utility waived its right to appeal its first three evidentiary issues regarding Glasscock's testimony by failing to properly raise the issues at trial;

6.       Whether the Utility waived its right to appeal its fourth issue based on the sufficiency of the evidence by failing to renew its motion for directed verdict at the close of the proof;

7.       Whether the trial court abused its discretion by excluding from trial evidence of lease negotiations between Wildwood and the Utility.

For the following reasons, we vacate the judgment of the trial court and remand for a new trial.

## III. DISCUSSION

The Tennessee Constitution provides that no man's property shall be taken, or applied to public use, without the consent of his representatives "'or without just compensation being made therefor.'" *Nashville Hous. Auth. v. Cohen*, 541 S.W.2d 947, 950 (Tenn. 1976) (quoting Tenn. Const. Art. 1, § 21). Accordingly, "a court's objective in an eminent domain proceeding is to award just compensation to the landowner for the taking." *State v. Brandon*, 898 S.W.2d 224, 226 (Tenn. Ct. App. 1994) (quoting *State ex rel. Comm'r v. Williams*, 828 S.W.2d 397, 400 (Tenn. [Ct.] App. 1991)). However, condemnation "is not in the nature of a wrongful taking for which damages are to be assessed." *Wray v. Knoxville, L.F. & J.R. Co.*, 82 S.W. 471, 473 (Tenn. 1904). The burden is on the landowner to show the value of the property taken. *Lebanon & Nashville Tpk. Co. v. Creveling*, 17 S.W.2d 22, 24 (Tenn. 1929); *Williams*, 828 S.W.2d at 402. Generally, as one would expect, "the property owner is trying to establish the

highest value possible for the property to be taken and the condemnor is trying to establish the least value for the property." *Town of Erin v. Brooks*, 230 S.W.2d 397, 399 (Tenn. 1950). The finder of fact must evaluate the evidence presented by both sides to arrive at a fair and just compensation for the property taken. *Id.*

In Tennessee, "just compensation must be measured by the fair market value of the land in view of its value for all available uses as distinguished from its value for the best use." *Layne v. Speight*, 529 S.W.2d 209, 214 (Tenn. 1975). This rule has been applied in Tennessee condemnation cases for over a century. One of the seminal cases applying this principle is *Alloway v. City of Nashville*, 13 S.W. 123 (Tenn. 1890), where the City of Nashville condemned property for reservoir purposes. The issue on appeal was whether the landowners should have been permitted to show the property's "particular value as a reservoir site." *Id.* at 123. Our supreme court explained that the "just compensation" required by our Constitution is "the fair cash value of the land taken for public use, estimated as if the owner were willing to sell, and the corporation desired to buy, that particular quantity at that place and in that form." *Id.* The court added,

> It includes every element of usefulness and advantage in the property. If it be useful for agriculture or for residence purposes; if it has adaptability for a reservoir site, or for the operation of machinery; if it contains a quarry of stone, or a mine of precious metals; if it possesses advantage of location, or availability for any useful purpose whatever; all these belong to the owner, and are to be considered in estimating its value.

*Id.* However, the court explained that it is inappropriate to restrict the estimate of value to any one use because doing so "would tend to make the degree of benefit to the party appropriating and condemning for a particular purpose the real measure of value, which is never allowable." *Id.* For example,

> "where a condemnation is sought for the purposes of a railroad, to single out from the elements of general value the value for the special purposes of such railroad is, in effect, to put to a jury the question, what is the land worth to the particular railroad company? [R]ather than what is it worth in general? The practical result would be to make the company's necessity the landowner's opportunity to get more than the real value of his land."

*Id.* at 124 (quoting *Stinson v. Railroad Co.*, 6 N.W. 784 (Minn. 1880)). The supreme court concluded that the trial judge appropriately rejected the landowners' evidence of the

property's "amount of value for a reservoir site" and correctly instructed the jury that it "could not single out and estimate the value for a special purpose." *Id.* When estimating the market value of property, the particular purpose for which a piece of property is most adaptable must be considered, but "the value for such a purpose exclusively cannot be shown in proof, and made the sole basis of a recovery[.]" *Id.* Instead, "the market value in view of all available uses is the measure of compensation." *Id.*

Another case that illustrates the point is *McKinney v. City of Nashville*, 52 S.W. 781 (Tenn. 1899). The condemned property at issue was more valuable, because of its location, for saloon purposes than any other. *Id.* at 781. In fact, when the condemnation suit began, the property was being used as a saloon under a lease for a term of five years. *Id.* In order to value the property, the trial court instructed the jury to consider all legitimate purposes for which the property could be used and its rental value for all legitimate purposes rather than confining its consideration to any one particular use. *Id.* On appeal, the property owner argued that if a saloon keeper would pay more for the property than any other, "why should the owner not receive the highest value which any one would give for the property?" *Id.* He argued that the property's "highest value for one use," or "most valuable use," should be deemed the property's value in the market without any consideration of the property's value for other uses. *Id.* Nevertheless, the supreme court stated that it did not hesitate to approve the trial judge's jury instruction. *Id.* The supreme court explained that in estimating market value, "all the capabilities of the property and all the uses to which it may be applied, or for which it is adapted, are to be considered, and not merely the condition it is in at the time, and the use to which it is applied by the owner." *Id.* (quotation omitted). The value of the land "'is to be assessed with reference to what it is worth for sale, in view of the uses to which it may be put, and not simply in reference to its productiveness to the owner in the condition in which he has seen fit to have it.'" *Id.* (quoting *Bridge Co. v. Ring*, 58 Mo. 491 (1874)).

In *Davidson County Board of Education v. First American National Bank*, 301 S.W.2d 905, 907 (Tenn. 1957), the supreme court noted that a minority of jurisdictions allow valuation of condemned property "for the best use," but the court reiterated that Tennessee courts use the "value in view of all available uses." Tennessee's "all available uses" formula is meant to avoid overvaluation by preventing the jury from giving excessive weight to the value for the purpose for which the property is being condemned. *Id.* at 908. When defining "the rule to be followed in this State," the supreme court held that just compensation must be measured by "'the fair market value of the land in view of all the purposes to which it is naturally adapted,'" and "'not the value for a special purpose.'" *Id.* (quoting *Sacramento Southern R. Co. v. Heilbron*, 104 P. 979, 981 (Cal. 1909)). "'[W]hile evidence that it is 'valuable' for this or that or another purpose may always be given and should be freely received, the value in terms of money, the price,

which one or another witness may think the land would bring for this or that or the other specific purpose is not admissible as an element in determining that market value[.]'" *Id.* (quoting *Heilbron*, 104 P. at 981).

"The courts are unanimous in admitting testimony on the adaptability of property for this use and for that, save for the familiar restrictions against the consideration of highly 'remote and speculative' contingencies. But it has been held in most cases that *a witness may not himself translate that adaptability into a statement of its money value.* A properly qualified witness may express an opinion that the property has a 'fair market value' of $10,000, and he may explain, both on direct and on cross examination, the particular qualities of the property which lead him to conclude that it is worth this amount. But he is not ordinarily permitted to testify that the property 'has a value of $10,000 for building lot purposes' or 'for the best use.'"

*Id.* (quoting *Orgel on Valuation* § 30 p.146) (emphasis added). The jury is likely to reach a figure between the higher and lower figures presented by the parties "at which it believes that the property might be sold for various purposes." *Id.*

Applying these principles, this Court reversed a jury verdict in *Memphis Housing Authority v. Mid-South Title Co.*, 443 S.W.2d 492, 501 (Tenn. Ct. App. 1968), due to the parties and some of the expert witnesses having placed "so much emphasis" on the value of the condemned property for potential use as a motel that the jury was probably influenced by the specific value stated for motel purposes. We explained that "the jury could not determine the value to the owners or any other person . . . for use as a motel," nor could they set the value based on the property's particular utility to the condemning authority or the landowners. *Id.* at 500. Instead, the jury was required to set the fair market value of the lots after a consideration of all the uses for which they were reasonably adaptable. *Id.* We recognized that the landowners were entitled to prove the feasibility of erecting a motel on their property, but it was not necessary or proper for them to introduce specific plans for construction of a nine-story motel with shops, offices, and a swimming pool, at a cost of over two million dollars, as such evidence "over-emphasize[d] in the mind of the jury the value of the lots to the owners for motel purposes." *Id.* We held that the evidence should have been excluded and remanded for a

9

new trial.  *Id.* at 502.

Determining whether a witness has crossed the line into overemphasizing a particular use is not always a simple task.  In *State v. Parkes*, 557 S.W.2d 504, 506 (Tenn. Ct. App. 1977), the landowners' property contained an abandoned gas station, and witnesses testified about the potential use of the property for commercial development, such as an office building or bank.  On appeal, we recognized and elaborated on "the rule that a witness in an eminent domain proceeding will not be allowed to state the value of the property for a specific purpose."  *Id.* at 508.

> This rule, a corollary of the requirement that all uses be considered in determining value, originally was used to protect against an overemphasis on the use for which the property was being taken, and to prevent the jury from valuing it in terms of its particular importance to the condemnor. *Alloway*, supra; see L. Orgel, *Valuation Under the Law of Eminent Domain* (2d ed. 1953), s 30, at 149. In *Davidson County*, supra, however, the rule was applied to uphold exclusion of a map, prepared by the landowners for use in the eminent domain proceeding, which detailed an imaginary plan for subdividing the property taken. Similarly, in *Memphis Housing Authority*, supra, it was held error to admit plans which were introduced by the owners of the taken property and which graphically depicted placement of a nine story motel on it. These cases, while stating broadly that testimony of value for a single particular purpose is inadmissible, clearly demonstrate that the concern underlying this rule is to prevent overemphasis of any single use of the property, and especially that overemphasis which results from depicting excessive details of a possible use. A broad prohibition against description and valuation of a particular use, however, may conflict with the widely acknowledged privilege of the witness to explain how he arrived at his value for the property, if he has taken the peculiarities of one particular use into account in making his estimate. Obviously, a balance must be struck. Since the major concern of the *Davidson County* rule [is] to prevent overemphasis of a particular use and its value, its effect must be to require excluding evidence of a particular use when it reaches the point of being an unreasonable emphasis on that use and not merely an explanation of the witness's valuation processes.

*Id.*  This Court determined that the witnesses' testimony about the possibility of commercial development of the lot with the abandoned gas station "did not reach th[e] point" of being an unreasonable emphasis of a particular use.  *Id.*  The witnesses

10

discussed the property's desirability for commercial rental but did not include any plans, maps, or oral descriptions of any particular possible project. *Id.* They discussed the possibility of constructing a commercial building on the property but did not venture "outside the bounds of reasonableness" when explaining their valuation testimony, nor did they unduly emphasize a value for a particular use in violation of the *Davidson County* rule. *Id.* at 509. The witnesses did use rental value when addressing the value of the property, but we explained that "there is no absolute prohibition against admitting evidence of rental value, at least where it is presented and interpreted by an expert as a criterion in his assessment of the property's fair market value." *Id.* It did *not* appear to this Court that the witnesses used rental value "as the sole test of value rather than as a guide to the property's worth in the market." *Id.* As a result, we found no error in the trial court's admission of the testimony. *Id.*

On the other hand, in *Love v. Smith*, 566 S.W.2d 876, 877-79 (Tenn. 1978), the supreme court held that an expert witness's testimony was improper when he valued condemned property based solely on its adaptability for use as a subdivision without considering its current use for farm purposes. Again, the court held, "it is improper to base the value of land solely upon its use for a particular purpose, such as, 'its highest and best use.'" *Id.* at 878. The highest and best use may be considered, but it may not be the sole measure of determining value. *Id.* "A corollary of this principle is that expert witnesses in expressing their opinions of value should not be allowed to give their opinions as to the value of property for a particular purpose." *Id.* (quotation omitted).

In accordance with these standards, Tennessee Code Annotated section 29-17-1004 was enacted in 2006 to provide that "in any condemnation proceeding in this state, an appraisal of the property must be obtained. The appraisal shall value the property *considering* its highest and best use, its use at the time of the taking, and any other uses to which the property is legally adaptable at the time of the taking." (Emphasis added.)

We now turn to the trial court's ruling in this case regarding Glasscock's testimony. This Court "reviews a trial court's decision to admit or exclude evidence, including a ruling on a motion in limine, under the abuse of discretion standard of review." *Allen v. Albea*, 476 S.W.3d 366, 377 (Tenn. Ct. App. 2015). A trial court abuses its discretion when it applies an incorrect legal standard or reaches a decision that is against logic or reasoning that causes an injustice to the party complaining. *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 131 (Tenn. 2005) (citing *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001)). "'A trial court that premises its analysis on an erroneous understanding of the governing law acts outside its discretion.'" *Wicker v. Comm'r*, 342 S.W.3d 35, 37 (Tenn. Ct. App. 2010) (quoting *Gov't Employees Ins. Co. v. Bloodworth*, No. M2003-02986-COA-R10-CV, 2007 WL 1966022, at *5-6 (Tenn. Ct.

App. June 29, 2007)). The standards set forth above, in *Davidson County* and its progeny, as well as the statutory directive, are those that the trial judge should employ when exercising his discretion to admit or exclude evidence. *See Nashville Hous. Auth. v. Cohen*, 541 S.W.2d at 952.

In support of its motion in limine to exclude Glasscock's testimony, the Utility submitted Glasscock's appraisal report and deposition testimony indicating his opinion that the highest and best use of Wildwood's property was for the sale of water. "Therefore," Glasscock's report stated, "the valuation of this property will involve an analysis of the present value of future income derived from water sales." As stated above, he estimated the landowner's net operating income from the sale of water at $25,000 per year by estimating the price of fresh water and multiplying it by the amount of water the Utility anticipated using. He used a low capitalization or risk rate of 6% because the Utility had a strong interest in the property and was "ready to sign" a long-term lease before Wildwood withdrew its consent. Applying this risk rate to the estimated annual rental income, he reached an overall fair market value of the property of $417,000 ($25,000/.06 = 416,666). Glasscock was asked during his deposition if his appraisal for the value of the condemned property was based on the use of the property "for the particular purpose of selling water to [the Utility]," and he replied, "Yes. To an extent." He noted that there could be other buyers for the water. However, he later admitted, "I'm basing this solely on what I have come to understand as the rate that Ocoee [Utility] is willing to pay for this property. And I have not made any comparison analysis as to what anyone else is paying." He was asked if a prudent investor would be willing to purchase the condemned property for $417,000 and replied that it would be more accurate to say that "there is a great probability that a prudent investor would be willing to purchase *the right to receive this income* for $417,000." (Emphasis added.) He said, "In this particular case, I'm appraising the value of the right to receive income. It's based on a contractual agreement between the landowner and Ocoee [the Utility]."

The trial judge did not rule on the Utility's motion in limine before trial, but the Utility renewed the motion before Glasscock took the stand and sought to exclude Glasscock's testimony in its entirety. The Utility argued that it was inappropriate for Glasscock to base his entire valuation opinion on the Utility's need for the property in question and on the value of the water, effectively increasing the value of Wildwood's property based on the Utility's interest in it. The trial court said he would "let the expert testify and we'll do what we have to do as it comes in." Glasscock's trial testimony, while not as detailed about his valuation calculation, confirmed that he based his valuation of the property only on its use as a water source for the Utility (and resulting rental income for Wildwood). He testified that he considered Wildwood's present use of the property and concluded that Wildwood was using the property at its highest and best use by renting it for the pumping of water. Glasscock explained the four criteria that he

considers in determining the highest and best use and said "[t]hose are fancy words of saying, what is a prudent buyer or seller for this property going to pay *if it is utilized* meeting all four of those characteristics," at its highest and best use. (Emphasis added.) He said, "Nobody in their right mind, if you own it, would sell it just for its land value."

Glasscock generally described various approaches for valuing property and said that he chose the income approach for valuing Wildwood's property, as it is normally used for properties that are purchased for their rental potential. According to Glasscock, the income approach is "a way of converting rental income into a value." He explained that the income approach "analyz[es] rental income" using a simple equation to arrive at fair market value. He said, "You analyze the rent and say, well, if I'm renting the property for x dollars, it would probably be worth this amount." He said that the income analysis "is really a rental analysis." Glasscock described, in general terms, how he determines a fair rental rate for a property and then turns the number into a value by applying a "risk rate" or capitalization rate. He was asked if he applied his usual approach when appraising Wildwood's property and responded:

> Yes. It's a very unique property, though. It is not often that you find somebody wanting property for such a unique reason. And I – I'm going to seem like I contradict myself here, but this particular property has a very unique purpose. And how in the world do you go out and find, well, what are similar properties being rented for? This is so unique, that that kind of information is really scarce. So you have to make some judgment calls based on that. And this particular piece of property, I had a history of income. And there's evidence out there that what similar properties are commanding,[5] and so you use that kind of information to arrive at that conclusion.

Glasscock then opined that the appraisal value of the 7.39-acre tract in this case was $417,000. However, he did not state what rental rate or capitalization rate he used in his underlying calculation to reach this figure, and his appraisal report was not admitted into evidence at trial. Glasscock simply said, "I took what I thought was a very reasonable rental income, I turned it into a value." Glasscock acknowledged that he used the "sale of water" in his appraisal report when determining the rental rate he used in his calculation. Glasscock went on to say, "The rental rate is based on water, for sure . . . . You're buying the right to the water[.]" The Utility renewed its previous objection and moved to strike all of Glasscock's testimony, but the trial court ruled, without further argument, "I'm going to let him testify. Go ahead." Glasscock later testified that "what I'm really looking for is what will the market pay *for this income*." (Emphasis added.)

---

[5]Despite this reference to "what similar properties are commanding," Glasscock later testified that he looked for similar properties in Bradley County and was unable to find any.

Having carefully reviewed Glasscock's testimony in light of the applicable caselaw, we conclude that the trial court should have excluded his testimony. The existence of the spring on the property was appropriate for *consideration* when determining the fair market value of the condemned property. *See Alloway*, 13 S.W. at 123 (explaining that every element of usefulness and advantage in the property is to be considered, such as a quarry of stone or a mine of precious metals). Likewise, the history of rental income from the property could be considered as *a factor* impacting its value. *See McKinney*, 52 S.W. at 781 (affirming the trial court's jury instruction to consider all legitimate purposes for which the property could be used and its rental value for all legitimate purposes). However, it was not appropriate for Glasscock to calculate the fair market value of the condemned property by looking *solely* to the rental income from the use of water on the property and simply "turn[ing] it into a value." Interestingly, Wildwood recognizes in its brief on appeal that Glasscock "appraised the condemned property based on its rental value." However, just compensation must be measured by "the fair market value of the land in view of all the purposes to which it is naturally adapted," and "not the value for a special purpose." *Davidson County*, 301 S.W.2d at 908. Evidence of net income from the property is competent evidence, but it "is not controlling." *Creveling*, 17 S.W.2d at 26. Evidence of rental value is permissible "where it is presented and interpreted by an expert as a criterion in his assessment of the property's fair market value" and used as "a guide to the property's worth in the market." *Parkes*, 557 S.W.2d at 509. However, rental value may not be "the sole test of value." *Id.* "[A]ll the capabilities of the property and all the uses to which it may be applied, or for which it is adapted, are to be considered, and not merely the condition it is in at the time, and the use to which it is applied by the owner." *McKinney*, 52 S.W. at 781.

Like the landowner in *Davidson County*, Wildwood impermissibly "hinge[d] its proof" on the value of the property purely for one purpose. 301 S.W.2d at 909. Because Glasscock determined the property's value for a specific use, rather than the fair market value of the property giving due consideration to all the capabilities of the property and all the uses to which it could be applied, his testimony should have been excluded.

We find this case factually and procedurally analogous to *City of Gatlinburg v. Fox*, No. 03A01-9606-CV-00199, 1996 WL 673992 (Tenn. Ct. App. Nov. 22, 1996) *aff'd and remanded* 962 S.W.2d 479 (Tenn. 1998).[6] The City of Gatlinburg condemned property consisting of pastures and woodland for the site of a new landfill after consideration of the property's size, soil content, accessibility, and proximity to an older landfill. *Id.* at *1. Just as the Utility did here, the City of Gatlinburg filed a motion in limine prior to trial seeking to exclude the testimony of the landowners' expert witness

---

[6]The Tennessee Supreme Court granted permission to appeal in *Fox* and affirmed a ruling of the court of appeals regarding a remittitur. However, the supreme court did not review the valuation issues addressed by the court of appeals and discussed in this opinion.

14

because he allegedly based his opinion of the property's value solely upon its highest and best use. *Id.* The trial court permitted the expert to testify but ruled that he would not be allowed to limit his appraisal to the land's highest and best use. *Id.* At trial, the expert testified that the property was uniquely suited for use as a landfill, and this would be its highest and best use. *Id.* at \*5. He acknowledged that the property's suitability for such use was the reason he placed a high value on the property and conceded that he did not include any farm sales in his analysis. *Id.* After reviewing the testimony, we concluded that, contrary to the trial court's directive, the expert did in fact base his opinion of value only on the highest and best use by calculating "the value of the land based only upon its use as a landfill." *Id.* Even though the expert purportedly "considered" other uses for the land, such as residential use or farming, he apparently "discarded them and did not factor the land's value for those purposes into his calculations." *Id.* We deemed this insufficient, stating:

> We believe that the principles of valuation expressed in the cases contemplate more than the computation of a piece of property's overall value based solely upon its highest and best use, preceded by a mere acknowledgement that other possible uses exist. Land values based upon these other uses must be taken into account in calculating the property's value.

*Id.* Because the expert improperly used the property's highest and best use as a landfill as the sole measure of valuation, we deemed his testimony improper. *Id.* The jury's verdict was closer to the valuation suggested by this particular expert than that of any other witness. *Id.* Consequently, we concluded that his testimony substantially influenced the jury verdict, and its admission did not constitute harmless error. *Id.* We vacated the jury verdict and remanded for a new trial. *Id.* We explained that on remand, the property's potential for use as a landfill could properly be considered in the overall determination of value, but the use of the property as a landfill could not be the *sole* measure of its value. *Id.* at \*7.

The same holds true here. The jury's verdict was obviously influenced by Glasscock's impermissible valuation testimony, as it adopted the identical figure he suggested -- $417,000. We are left with no choice but to vacate the judgment of the trial court and remand for a new trial.[7]

---

[7]We reject Wildwood's assertion that the Utility waived its right to complain about the admission of Glasscock's testimony and its alleged violation of the *Davidson County* rule by failing to give the trial court a meaningful opportunity to rule on the issue. The Utility's motion in limine regarding this issue was filed months before trial. During the jury trial, when the parties were addressing some "housekeeping" matters with the trial judge outside the presence of the jury, the trial judge mentioned "valuing the rental value of the property." Counsel for the Utility encouraged the trial judge to read the

We note that Wildwood raised an additional issue on appeal regarding whether Glasscock should have been permitted to rely on the proposed lease agreement between the Utility and Wildwood that was negotiated in 2012 but never signed when forming his valuation opinion. Because we have concluded that Glasscock's valuation testimony was inadmissible, we deem the issue pretermitted.

Wildwood also vaguely asserts that the trial court abused its discretion "by excluding from trial evidence of lease negotiations between Wildwood and the Utility." Without citation to authority, or the record, Wildwood asserts that the "lease negotiations" were relevant to the rental value of the condemned property. Having reviewed the transcript of the three-day jury trial, this Court recognizes that the trial judge made numerous rulings regarding the admissibility of various documents that pertained to the "lease negotiations" and also considered numerous objections to testimony from several witnesses regarding those negotiations. However, Wildwood does not cite to any particular portion of the trial record to identify which of these specific rulings regarding "evidence of lease negotiations" it seeks to challenge. In this section of its brief, its only citations to the record point us to: (1) a statement in a pretrial expert report from a third expert who did not testify at trial, and (2) a statement made by the trial judge during the hearing on the Utility's motion for new trial. Tennessee Rule of Appellate Procedure 27(g) provides, with regard to briefs on appeal, "If reference is made to evidence, the admissibility of which is in controversy, reference shall be made to the pages in the record at which the evidence was identified, offered, and received or rejected." Tenn. R. App. P. 27(g). "'It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived.'" *Cartwright v. Jackson Capital Partners, Ltd. P'ship*, 478 S.W.3d 596, 614 (Tenn. Ct. App. 2015) (quoting *Sneed v. Bd. of Prof'l*

---

*City of Gatlinburg v. Fox* case. Counsel explained that a new trial was ordered in *Fox* because the landowner's expert witness "based his real estate appraisal solely on the basis of the highest and best use, which we have repeatedly said is not appropriate." He said, "they exclude[d] the expert in that case for doing exactly what they're trying to do here." Counsel renewed his motion in limine just before Glasscock took the stand. He read aloud a sentence from Glasscock's appraisal report regarding the fact that the Utility "ha[d] expressed a strong desire to utilize this water source for the foreseeable future" and argued that it was inappropriate for Glasscock to base his entire valuation opinion on the Utility's need for the property in question and on the value of the water. The trial judge allowed Glasscock to testify. The Utility renewed its objections yet again during Glasscock's testimony when he acknowledged that his valuation opinion was based on rental income, and specifically, a rental rate "based on water." At that point, the Utility moved to strike all of Glasscock's testimony, but the trial court ruled, without further argument, "I'm going to let him testify." The issues were argued again in the Utility's motion for new trial. In sum, throughout the proceedings, the Utility repeatedly argued that Glasscock impermissibly based his entire valuation opinion solely on the particular use of the property as a source of water for the Utility and resulting rental income for Wildwood. We conclude that the *Davidson County* issue was not waived.

*Responsibility of Sup.Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010)). Due to the lack of sufficient citations to the record and to relevant authority, we deem this issue waived. All other issues are pretermitted.

## IV. Conclusion

For the aforementioned reasons, the judgment of the circuit court is hereby vacated, and this matter is remanded for further proceedings. Costs of this appeal are taxed to the appellee, The Wildwood Company, Incorporated, for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE